Blackwell *v.* Blackwell.

RANDAL S. BLACKWELL and others, appellants,

*v.*

LUCRETIA A. F. BLACKWELL and others, executors,
respondents.

1. Exceptions by creditors to an executor's account must be taken
in the manner provided by statute. (*Rev., Orphans Court,* §§ 86–88.)

2. In selling their testator's real estate, the executors allowed the
widow, who was one of the executors, to fix arbitrarily and retain out
of the purchase-money the amount claimed by her as the value of her
dower. Such amount being in excess of the true value of her dower,—
*Held,* that they must account for the difference.

3. The executrix, by collusion with the auctioneer, bought part of
the personalty at less than it would have brought if fairly sold.—*Held,*
that the executors must account for the difference between the price
paid by her for the property at the auction and the inventory valua-
tion thereof.

On appeal from decree of Hunterdon orphans court.

*Mr. R. S. Kuhl* and *Mr. G. A. Allen,* for appellants.

*Mr. H. A. Fluck* and *Mr. J. T. Bird,* for respondents.

THE ORDINARY.

The petition of appeal presents various subjects for adju-
dication, all of which, except those upon which I am about
to pass, have been, by consent of the counsel of the parties
at the hearing of the appeal, withdrawn from consideration.
Augustus Blackwell, late of the county of Hunterdon, by
his will made on the 7th of January, 1874, after directing
that his debts and funeral expenses be paid, gave to his wife
(whom, and his brother Bloomfield, he appointed executors
of his will) any of the household furniture in his house
which she might need for housekeeping, any cow she might
select from his herd, and the sum of $200. He then gave
to his daughter, Annie M. Blackwell, the set of bed-room

Blackwell *v.* Blackwell.

furniture which was then in her room, a cow, and the sum of $300. To his son Charles he gave the. buggy wagon which the former was accustomed to use, the harness which he used with it, and a colt, to be selected by Charles from the testator's stock of horses; and also the sum of $200, and the testator's wearing apparel. He gave the residue of his estate to his wife and two children, in equal shares, and provided that his executors should advertise his real estate to be sold at private sale for a year, if it should not be sooner sold; and directed that, if it should not be sold at the expiration of the year, they should sell it at public sale. His personal property consisted of his household furniture and the stock, &c. on his farm, and some pecuniary claims. His real estate consisted of the farm of about two hundred acres on which he lived (which appears to have been mortgaged for more than its value), a tavern property of about seven acres, and two houses and lots. The executors sold the personal property at public auction, part of it on the 10th of March, 1874, and the rest subsequently. They also sold the real estate at public auction; the tavern property and the houses and lots on the 21st of November, 1874, and the farm on the 3d of December following. When the first sale of personal property took place, the executors were not aware that the estate was insolvent, as it proved and was afterwards duly declared to be. The second sale of the personal property took place in February, 1875, after it had been ascertained that the estate was insolvent: Much of the controversy between the parties has arisen in reference to that sale and the sale of the real estate.

The possession of the farm was delivered, on the 1st of April, 1874, to Mrs. Vanderveer, holder of the third mortgage (which was for $4,000 and interest) thereon, as mortgagee thereof. She. and her husband leased it to Mrs. Blackwell, the executrix, for one year from that time at the rent of $280, the interest for a year on Mrs. Vanderveer's mortgage. The property was sold, as before stated, on the 3d of December, 1874. Though it was, by consent of the

mortgagees and Mrs. Blackwell, sold free of all encumbrance by mortgage or of dower, the sale was subject to Mrs. Blackwell's right as tenant to enter upon the property, take care of, harvest and thresh and remove the then growing crop of winter grain. The property brought at the sale $13,835.50. It was bought by Henry C. Ripearson. The principal of the mortgages on it amounted to $15,000.

The appellants allege that the executors retained out of the proceeds of the sale, among other sums, for expenses, &c., $20 for auctioneer's fees for selling the farm, and $399.21 for their commissions on the amount at which the property was sold, and they therefore object to the allowance of a credit of $20 for auctioneer's fee paid William S. Riley, on the 3d of December, 1874, contained in the executor's account, and for which they ask allowance, and to the allowance of commissions in the account in respect to the proceeds of the sale of the farm. Mr. Riley testifies that his compensation for selling all the real estate, including the farm and the adjournment of the sale thereof, was $20. They are not entitled to allowance in their account for either the $20 or their commissions on the amount of the proceeds of the sale.

The appellants further insist that the value of the rent of the farm for the year during which it was held by Mrs. Blackwell, under the lease from Mrs. Vanderveer as mortgagee, was at least $600, and that, therefore, the demand of Mrs. Vanderveer for deficiency is greater than it ought to be by at least the difference between $600 and the amount of rent agreed upon, $280. The rent for that year, according to the proof, should have been as much as $600. But the question of the liability of the mortgagee to account for the difference cannot be entertained in this proceeding. If the exceptants had desired to litigate it, they should have done so in the manner provided by the statute. (*Rev., Orphans Court*, §§ 86–88.) They have not done so.

The sale of the other real estate (the tavern property and the two houses and lots) is brought under consideration by

reason of the objection made that the price accounted for by the executors is not as much as it ought to be.   The conditions of sale declared that both properties were sold "subject to the right of Lucretia Blackwell as widow of Augustus Blackwell, deceased, but free and clear of all encumbrance by mortgage."   The tavern property was struck off to Charles B. Blackwell, the testator's son, at $1,997.50, and he signed an acknowledgment that he had purchased it at that price.   The other property was struck off to Jonathan Hunt, at $600, and he, too, signed an acknowledgment that he had purchased it at that price.

It appears that the auctioneer, to prevent misunderstanding, proclaimed, during the sale, that the sum which any person should bid would be the price at which he should have the property, leaving it to the executors to release the property from Mrs. Blackwell's claim for dower and any other encumbrances thereon.   It appears, also, that it was proclaimed or understood, at the sale, that the widow would accept $700 for her dower in the tavern property, and $400 for her dower in the other; and, in the settlement of the purchase-money, she received those sums accordingly. This method, by which she was allowed to fix the pecuniary value of her dower in the property at such sum as she thought proper, is obviously liable to most serious objections.   There does not appear to have been any check upon her valuation, nor any consideration as to its fairness. She was about fifty years of age.   Assuming that she was in good health, with the ordinary average expectancy of life, and making no deductions for encumbrances on the property, the value of her dower, by commutation, according to the tables, in the tavern property, would have been only $419.47, and on the other property, only $140.70; yet, in the one case she was allowed to fix it at $700, and in the other at $400, and received those amounts accordingly.   She should not be permitted to retain this advantage. The executors must account for the difference between

Blackwell v. Blackwell.

the amounts allowed her and the amounts which her dower in the respective properties were actually worth.

In the spring immediately following the death of the testator, a large quantity of the manure on the farm was spread upon the land for the benefit of the widow as lessee. The orphans court charged her with $100 for it. I am not satisfied, from the proof, that the amount of this charge is not sufficient. The proof as to the amount of the manure is somewhat vague. Nobody, indeed, speaks definitely on the subject. There is an admitted error of $3.15 in favor of the executors in the charge of $44 for carting.

The executors ought to be charged with the difference between the inventory price of all the articles purchased by the widow at the second sale of the personal property and the price at which they were struck off to her. In the first place, she, a trustee, purchased at her own sale of the trust property. In the next place, the sale was so conducted as to secure to her, at merely nominal prices, all of the property which she desired to retain. The auctioneer not only did not encourage, but he refused bidders. He admits that he said to the persons present, before the sale began, that "the sale was one of rather a peculiar nature; that some of the property or goods in the house had been brought there by the widow, but, the estate being insolvent, they would have to revert to the benefit of the estate or creditors, and she, as executrix, was compelled to sell them to the highest bidder," or words to that effect. He adds that he said, also, that an opportunity would be given to every one to bid, and that, if the widow bought, she must buy like the rest. He says that he was aware, before he made the proclamation, that the widow intended to purchase—that she herself told him so.

David Conover says, the auctioneer "commenced by saying that Augustus Blackwell had made a will, and had left the household goods to Mrs. Blackwell, all she saw fit to take; and that it had turned out that the property would not pay the debts, and the household goods would have to

Blackwell v. Blackwell.

be sold. He also said it was hard for Mrs. Blackwell; that she had brought a good many goods there, and that the length of time she had been married would not let her keep them, and they had to . be sold." He says the auctioneer said a great deal more, but that is about the substance of it; that he preached about half an hour about the sale, selling the goods, and it being hard for the widow, which, he says, they all knew.

An instance is given in the testimony of the auctioneer's ignoring a bid, in favor of the widow, and striking off to her, at $5, the articles (a bed and its furniture) in gross, which were worth $50. A cupboard, with the glassware and crockery in it, was set up on her bid of $3, and struck off to her thereon. Drawers full of bed and table linen were struck off to her at prices but little more than nominal. The auctioneer bid for her, declaring that the bids were hers. Conover says that, frequently, during the sale, the auctioneer would try to excite the sympathies of the people for the widow; that he would say she had brought from home many of the goods; that he would say: " Gentlemen, you have a right to bid;" that he would set up the articles, and, without giving others an opportunity to bid, would strike them off to her. He significantly adds, that there was, once in a while, a bid which the auctioneer would not refuse to take. The sale was, manifestly, conducted in such a manner as to serve, as far as possible, the interest of the widow.

There is no specific exception as to the failure of the executors to charge themselves with the amount ($20) at which the testator's wearing apparel was appraised and inventoried; nor is there any testimony on the subject. The attention of the orphans court was not, it would seem, drawn to the matter. The will gave the testator's wearing apparel to his son. It appears that the executors were not aware, for some months after the testator's death, that the estate was insolvent. The household furniture and other chattels given to the testator's widow and children, by

specific bequest, were delivered over to them and retained by them until the time of the second sale of personal property, which was more than a year after testator's death. Whether the apparel had become valueless by use in that time does not appear. As before remarked, the attention of the court below was not called to it, and there no evidence on the subject.

The appellants insist that the executors should themselves have put in the claim of Catherine Blackwell, a minor, whose guardian the testator was, among the debts of the estate; and they ask that the executors be directed by the court to do so now. The ground taken by them is, that the executors were the proper persons to put in the claim as successors of the testator in the trust. It appears that the executors found, among the papers of the testator, two promissory notes, which were understood to belong to his ward. They were advised by their counsel, that the claim of the ward against the estate in their hands must be put in like any other debt, and that it was no part of their duty to put in the claim. This matter was not the subject of exception on the part of the creditors. There was, in fact, no exception filed to the account on this score, and no investigation into, or adjudication upon it, was had or made in the court below. The remedy of the ward, who, it may be remarked, is not now before this court, must be sought elsewhere.

It remains to consider the question of costs. Some of the exceptions to the account were, according to the judgment of the orphans court, well taken. The executors are in no position to ask that the costs of a proceeding, rendered necessary by their dereliction of duty, should fall on the estate. They were neither entitled to counsel fees nor costs. They should pay costs, both below and here.